CLARK, Retired Circuit Judge.
A jury found appellant-defendant guilty under an indictment charging him with robbery of Robert Hogan. The property allegedly taken was lawful currency of the United States of America of an aggregate value of $320.00. The court fixed defendant’s punishment at imprisonment for life and sentenced him accordingly.
The statement of facts in appellant’s brief is adopted by appellee as substantially correct. We treat it accordingly. The only eyewitnesses to the alleged robbery were the defendant, the victim and a man by the name of Brashers, who according to the undisputed evidence was killed by a dutiful law enforcement officer soon after the robbery. The only eyewitnesses who testified as to the robbery were defendant and the victim.
According to the testimony of the victim, Robert Hogan, he was the manager of Sandy Motors, a used-car lot on Highway 31 South in Decatur on September 13, 1979, when defendant and Brashers came to Sandy Motors and inquired about a 280Z Datsun automobile. They came on two occasions that day, first about 3:00 P.M. and the other about 3:15 P.M. Only Brashers talked to Hogan about purchasing the Dat-sun. During the interval they were gone from the lot, Mr. Hogan received a telephone call from a person who said he was the young man who had just looked at the Datsun and that he was returning to discuss purchasing the car. Upon the return of Brashers and defendant, Hogan and Brash-ers again talked about the automobile. During the discussion, Brashers ordered Hogan to get up from his desk and told him he was being held up. Hogan stood up from the desk, and the defendant stuck a pistol to his back. Hogan was tied, gagged and placed on the bathroom floor, and the money was taken from him. Hogan did not know whether Brashers or defendant took the money; he did not know if defendant said anything after Brashers told Mr. Hogan that he was being robbed. Mr. Hogan remained tied up in the bathroom for approximately ten or fifteen minutes before untying himself. Brashers was bearded and wore a straw cowboy type hat. Hogan did not recall seeing a knife on Brashers.
*723 Defendant testified that on September 13,1979, he lived in Huntsville with his wife and child, that Brashers came by his home that day and asked him to ride with him to Decatur to pick up an automobile. He got in the car Brashers was driving, which belonged to Brashers’ girl friend, and Brash-ers drove it to Decatur, after stopping at Krogers in Huntsville to cash a check and putting some gas in the car. They stopped at Sandy Motors on two occasions, and Brashers talked with Mr. Hogan about purchasing the Datsun. After Brashers stopped at the car lot the second time, he drove to a telephone booth in a shopping center and made a phone call while defendant remained in the car. When Brashers returned to the automobile, he told defendant he was going to steal the Datsun 280Z.
According to further testimony of the defendant, he told Brashers he did not “want any part of stealing anything,” and Brashers told him that if he did not help him steal the car, he would kill the defendant and the defendant’s wife and child. Brashers then removed a pistol from a brief case, told defendant it was unloaded and handed the pistol to defendant. While in the automobile, Brashers obtained another pistol from under the driver’s seat. He told defendant that the pistol he handed him was to be used by defendant and for defendant to get behind Hogan with the pistol. Defendant also said that during the time he was with Brashers, Brashers had a “factory made knife” in a “brown pouch or holster on his side.”
As to what happened while defendant and Brashers were together in the room or office of Mr. Hogan and upon Mr. Hogan’s return to the room after talking a short time with a prospective customer, the defendant testified:
“While we were in there; Woody [Brash-ers] and I, Woody kept asking me if I was going to do it, if I was going to do it, and if I was afraid to do it, and that made me that much more frightened of him because I didn’t want to do it. I knew that if I didn’t he would kill me and kill my family. Okay, Mr. Hogan and his customer came back in from the outside lot and went into a front office and sat down. I was standing by the wall and Woody was still in the front room with me. He went up and asked Mr. Hogan if he could use the phone and call his mother. Woody went back in then and used the phone on the front desk in the front office and he made a phone call and I guess he was acting like he was talking to his mother. Then he hung up and then Mr. Hogan’s customer left and Mr. Hogan came back into the room where we were. As I said, I was afraid of Woody and what he had told me and I was trying to put it off for as long as I could and he was always watching me everywhere I went. Everywhere I stood his eyes was on me and he was right there beside me. Mr. Hogan came back in and sat down and Woody was still sitting in front of the desk. They were talking for a few minutes and I was standing over by the wall and then Woody looked at me and kind of nodded his head a little bit and that scared me even that much more because I didn’t want to do it even though he had told me he would kill me. I had to gather all the courage I could to do what he had said. I walked over to the window, stood in front of the window for a few moments and turned around and walked behind Mr. Hogan and put the gun to Mr. Hogan’s back. When I put the gun to Mr. Hogan’s back he raises up and Woody jumps up and he takes some black straps from his pocket and — ”
According to further testimony of the defendant, when Hogan stood up, defendant took the gun from his back “and let it fall to my side.” Brashers then, tied Hogan, put him in the bathroom, and took his money and money clip. Thereupon, Brashers took the keys for the Datsun off the keyboard, pitched them to defendant, told defendant he was going to get gas for the car, and ordered defendant to drive in front of him. Defendant drove the vehicle Brashers had been driving that day, and Brashers drove the stolen 280Z Datsun to a gas station where Brashers purchased gas. Defendant then drove out highway No. 67 *724 toward Interstate 65. He had placed the pistol he had been handed by Brashers under the driver’s seat. While on Highway No. 67, Brashers directed him by use of his blinker lights to pull over. According to the witness, the following then occurred:
“I pulled into that restaurant, sir, and he pulled in on my left side. He come to the passenger’s side of the car on the far side and opens the door and grabs his brief case and reaches under the seat and pulled out the long pistol and told me that we were going to Huntsville. To get on the Interstate. With that he shut the door. I waited for traffic to clear and pulled out.”
His long testimony ended with testimony to the effect that he proceeded north on highway 1-65 to the Huntsville exit (Highway 20 exit) where he and Brashers turned off in the respective automobiles they were driving. There is no evidence that they were in company, observation, or conversation with one another thereafter. Details as to what happened to Brashers after he turned off to go in the direction of Huntsville are not shown by the evidence presented to the jury, but we state for the purpose of a better understanding of one or more issues discussed hereafter that in proceedings on the trial out of the presence of the jury, it was shown that law enforcement personnel of Morgan, Limestone and Madison County had been alerted as to the robbery, that they were on the lookout for the robbers and that there was a confrontation thereafter between Brashers and an officer, in which the officer was shot by Brashers, but that as badly wounded as the officer was, he returned fire and succeeded in killing Brashers.
It is to be observed from the foregoing summary of the testimony of the defendant and the victim of the robbery that there is little conflict in the evidence. The parties are in agreement that the issue of defendant’s guilt turns on whether his participation in the robbery of Mr. Hogan was the result of coercion or duress exerted upon him by Brashers. The issue was presented to the jury, which resolved it against the defendant. Its verdict is supported by the evidence, and there is no contention to the contrary.
In the process of qualifying and selecting the jurors for the trial of the case, counsel for the defendant asked the members of the panel from which the jury was to be selected the following questions:
“Have any of you ever yourselves been the victim of a crime of violence of any sort, such as being shot at, shot, stabbed, robbed, burglarized?
“Any of you have any close members of your family; those are the same folks that I just mentioned to you, that has ever been victims of a crime just like we have talked about? Close friends or family?
“Anyone else that has had a good friend or family or yourselves that has been a victim of any sort of criminal activity?”
In a motion for a new trial, defendant asserts in each of three grounds thereof that a member of the jury, one who became the foreman of the jury, “failed to truthfully answer” one of the above questions. It is without dispute that the particular juror did not respond to any of the questions. It is uncontroverted that only an affirmative answer, if true, was required.
On the hearing of the motion for a new trial, the particular juror was called as a witness by the movant. No other witness testified on the hearing. The juror was intensively interrogated by each party. That part of his testimony that defendant contended should have been revealed by the juror, at the time the prospective jurors were asked the three questions quoted above, is substantially covered by the following excerpt therefrom:
“Q. Was it your house actually shot by rifle or shotgun blast?
“A. My house was but I wasn’t.
“Q. Were you not in the house? You and your wife when it took place?
“A. We was.

“Q. Is it not true, Mr._, that your house, while you were inside, it was shot late one night.
*725 “A. Yes, sir.
“Q. And also on the same evening while you were in the house, wasn’t two vehicles that were in front of your house also shot. The glass and windows shot out?
“A. Yes.
“Q. And it happened just before midnight on May 3, 1979, did it not?
“A. Yes, sir.
“Q. And were you asleep when this took place?
“A. Yes, sir.
“Q. And the shotgun blast or the rifle blast that hit the house woke you up? “A. One or the other.
“Q. All right. There was several blasts at your vehicles and your house and one of them woke you up? is that what you are saying?
“A. No, I’m not saying that. Something woke me up.
“Q. Okay. Well, then after you work [woke] up did you then call the Decatur Police Department to come out and investigate the shooting of your house and vehicle?
“A. Yes, sir.
“Q. And did they in fact come out and investigate?
“A. Yes.

“Q. You didn’t know who this was, did
you,-?
“A. No, sir.
“Q. No one was ever charged?
“A. No.
“Q. No warrants taken out?
“A. No, sir.
“Q. No case in court?
“A. No case in court, no, sir.
“Q. Now, there has been a police report that has been submitted into evidence here about some shots being fired in front of your home back on May 3, 1979. At that time, I believe, the underpinning of your house was shot, is that correct?
“A. Yes, sir.
“Q. And some shots hit some vehicles out front?
“A. Yes, sir.
“Q. Were you out front at the time the shots were fired?
“A. No, sir.
“Q. Then you of your own personal knowledge don’t you know who the shots were fired at?
“A. No, sir.
“Q. You don’t know who fired the shots? “A. No, sir.
“Q. Then you don’t know who the victim — supposedly the victim of the crime was, do you?
“A. No, sir.
“Q. You don’t know if a gun battle took place in front of your house or who was being shot at, do you?
“A. No, sir.”
The police report that was introduced in evidence as to the incident further revealed that there were “three shotgun shells,” presumably empty, in the street in front of the juror’s house, and that the juror had stated that a named man had made threats against him because he had had the named man arrested and that the juror “thinks [the man named] could have done it.” There was no testimony as to the identity of the designated person. The juror was an ex-policeman.
Our review of the evidence on the hearing of the motion for a new trial and the transcript of the proceedings of the interrogation of the prospective jurors convinces us of the worthiness of serious consideration of the asserted grounds of the motion for a new trial, but we are not convinced that evasiveness by the juror is ascertainable from his silence under the circumstances. However, we cannot say with reasonable certainty that it was not. Much depends on the accuracy, clarity, tone and context of the questions asked. The more direct, specific and unambiguous they are, the more likely the evasiveness of a failure to respond affirmatively. It is argued by appellant that the fact that the juror was an ex-policeman indicates that he was more knowledgeable than the ordinary citizen as to whether to answer such questions affirmatively. Perhaps this is true, but, on *726 the other hand, his experience in his former status might have rightfully given him the view that an affirmative answer would not have been absolutely accurate. The evidence on the hearing was sufficient to show that probably the only incident involved, the firing of three shotgun shots in front of his house, was some “sort of criminal activity” as stated in one of the three questions and that the juror was a potential victim thereof, but it is not sufficient to show that he was the the victim of a crime of violence “such as being shot at, shot, stabbed, robbed, burglarized.” Of some significance is the fact that when the first question was asked, one juror answered that one night she and her sister were robbed when they were on the way home; when the second question was asked, another answered, “My husband was mugged in Baltimore, Maryland, not too long ago"; when the third question was asked, a prospective juror answered that a brother of his had been “shot.”
There is no contention that the firing of a shotgun in front of the juror’s house was of the same or kindred nature as the robbery alleged in the instant case. There is nothing to indicate that the particular incident would have made the particular juror biased or prejudiced against the defendant in this particular case, or that knowledge thereof by defendant or his attorney would have brought about an elimination of the juror from the jury finally selected. The trial court was not in error in overruling defendant’s motion for a new trial.
Appellant argues that the trial court committed prejudicial error in a ruling in favor of the State during the closing argument of counsel for defendant, as shown by the following excerpt from the transcript:
“MR. MOEBES: [Counsel for the State]: Your Honor, we object. There is absolutely no evidence as to anybody killing anyone.
“THE COURT: I sustain it. It’s outside the evidence.”
We quote and apply what was held in S. S. Kresge Co., d/b/a K-Mart v. Ruby, Ala., 348 So.2d 484, 489 (1977) in language of Justice Faulkner:
“K-Mart urges reversible error in a statement of opposing counsel during closing remarks to the jury. The record in this case does not disclose the challenged remark but only defense counsel’s objection thereto:
“‘MR. HENDERSON: We object to Big-K being connected to K-Mart. There has been no evidence of that, and I think he is talking about the financial status of K-Mart which is totally irrelevant, and further he is indicating that Big-K is a part of K-Mart, which it is not.
“ ‘THE COURT: Overrule your objection.’
“Since the record is silent as to the substance of the comment, we may not speculate about the prejudicial qualities thereof. Freeman v. Hall, 286 Ala. 161, 238 So.2d 330 (1970); Deverell v. Horton, 285 Ala. 588, 234 So.2d 879 (1970). In the matter of an attorney’s argument to the jury, much must be left to the enlightened judgment of the trial court, with presumptions in favor of its rulings. Dendy v. Eagle Motor Lines, Inc., 292 Ala. 99, 289 So.2d 603 (1974).”
Notwithstanding the fact that there is a difference between the instant case and the cited case in that in the one the court sustained the objection to the argument and in the cited case it overruled the objection to the argument, there is sameness in that in each case on appeal the argument to which the objection was addressed is not to be found in the record, which precludes review thereof on appeal.
The trial court refused the following charge requested in writing by defendant:
“Charge No. 54.
“The Court charges you, members of the jury, that if, upon considering all of the evidence, you have a reasonable doubt about the guilt of the defendant, arising out of any part of the evidence, you must find the defendant not guilty.”
*727 It has been consistently held since Rakestraw v. State, 211 Ala. 535, 537, 101 So. 181, 183 (1924), that such a charge states a correct proposition of law and that its refusal constitutes reversible error unless the charge is substantially covered in other instruction of the court to the jury. Atkins v. State, Ala.Cr.App., 369 So.2d 303 (1979); Smith v. State, 51 Ala.App. 527, 287 So.2d 238 (1973); Johnson v. State, 42 Ala.App. 511, 169 So.2d 773 (1964); Ernest v. State, 40 Ala.App. 344, 113 So.2d 517 (1959). Nevertheless, it is firmly established that a refusal of the charge does not constitute reversible error if it is substantially covered by the court’s oral charge or by any written instruction to the jury. King v. State, Ala., 356 So.2d 1220 (1977), rev’g King v. State, Ala.Cr.App., 356 So.2d 1216 (1977); Kennedy v. State, 291 Ala. 62, 277 So.2d 878 (1973); Buckelew v. State, 48 Ala.App. 411, 265 So.2d 195, cert. denied, 288 Ala. 735, 265 So.2d 202, cert. denied, 409 U.S. 1060, 93 S.Ct. 558, 34 L.Ed.2d 512 (1972). It is our view that the refusal of defendant’s requested charge 54 is saved from error by the court’s oral charge, particularly the following portion thereof:
“The law also provides that if you have a reasonable doubt of the guilt of the defendant, whether it’s based on this defense or any other bit of evidence, either evidence that is in the case or lack of evidence, then the reasonable doubt of the guilt of the defendant is sufficient to justify an acquittal of the defendant. The law provides that you must be convinced from the evidence beyond a reasonable doubt of the guilt of the defendant in order to convict him. (Emphasis supplied).”
One of the most seriously controverted questions of law during the trial of the case was as to the admissibility of evidence as to the transactions between Brashers and others that occurred after the automobiles being driven by Brashers and defendant left Interstate 1-65 at the Alabama Highway 20 exit north of the Tennessee River. The question first arose during the latter part of the direct examination of the defendant, in which there was a lengthy colloquy among the court and counsel for the respective parties that consists of approximately ten pages of the transcript, during which counsel for the State objected “to anything that occurred outside of Morgan County,” and the court attempted to explain that merely because something happened out of Morgan County did not prevent its admission in evidence and endeavored to obtain an expression from defendant’s counsel as to the specific evidence he wished to offer. During that time defendant’s counsel said:
“As I understand, you have a knife that was taken off — we expect the evidence to show that was taken off of Brashers. It was strapped on his belt with a pouch in Madison County directly up from Limestone County, which is also an issue here in this trial today.”
Soon thereafter the court conducted a hearing out of the presence of the jury in order for all concerned to come to a distinct understanding as to what defendant proposed to prove (and his reasons therefor) and as to the State’s objections and grounds thereof, which may not have been a complete success. We think it would improperly and unduly lengthen this opinion to quote such a colloquy in its entirety, but a part of it was as follows:
“THE COURT: Yes, hold the jury up just a minute. I will give you the benefit of a ruling on it, but I think it’s not necessary for us to get in a fuss about that on either side of this thing.
“MR. NELSON: Judge, may it please the Court, I intend to show by State Investigator Lt. Patterson and by other witnesses that approximately ten minutes or so or less and that after they left Moores-ville at 4:00 that Brashers was in Madison off in a field with this knife on his belt and he attacked a police officer. As I understand the Court’s ruling, I cannot call a witness and put that testimony on?
“THE COURT: I did not say that and I do not — All I am wanting to say now is don’t offer anything before the jury which I ruled out. Now, if anything comes up and you want to offer it before the jury to show something, let me know *728 if there is any question about it. If there is not any question about it, if it’s offered I will just have to rule on it at the time.
“MR. NELSON: Do I understand the Court’s ruling is that neither the State nor the defense can go into anything that ■happened in Limestone or Madison Counties?
“THE COURT: I didn’t say that. I have not ruled on anything like that. Right now I am ruling on the questions presented.”
The next witness called by defendant after he had testified was Lt. Patterson. During his testimony, defendant made repeated effort to introduce by him a knife that was found on the body of Brashers after he had wounded an officer and the officer had returned fire and killed Brash-ers near Madison. The court sustained the State’s objections. Thereafter defendant attempted to show by two witnesses details of an altercation between Brashers and a law enforcement officer near Beadingfield’s Store on Alabama Highway 20 about 4:00 P.M., the day of the robbery and that Brashers fired shots at the officer. The court sustained objections to the proposed testimony.
Before defendant’s case was closed, he called Mr. Roger Morrison of the Department of Forensic Sciences in the Huntsville regional laboratory as a witness. Mr. Morrison testified that he was present on September 13, 1979, in the city limits of Madison when a belt and scabbard were taken off the body of Brashers. Thereafter a large knife which it was stipulated was found near Brashers’ body “at the scene on September 13th,” was placed in the scabbard and it was shown that the scabbard would snap “if the mud wasn’t in there.” The State objected “unless it’s going to be properly connected up and identified as being a part of the crime here in Morgan County.” The court said that “on the assurance that a witness will identify that scabbard as the scabbard ... I am going to overrule that.” The transcript then shows:
“(Whereupon, said belt, knife, and scabbard were duly marked as Defendant’s Exhibits 1, 2, and 3 and received in evidence).”
Promptly thereafter, defendant testified that the “belt and belt buckle and scabbard were on Brashers when they were at Sandy’s car lot on September 13.”
We are of the opinion that the trial court was not in error in sustaining objections of the State to questions asked by defendant as to transactions in general, or the details of transactions, between Brash-ers and law enforcement personnel; that there was no showing by defendant of any specific evidence that it proposed to introduce that would have been admissible other than the evidence as to the belt, the scabbard and the knife found at the side of Brashers after he was killed, which were eventually offered and received in evidence. We find no error prejudicial to defendant in the rulings of the court with respect to what occurred after defendant and Brash-ers left 1-65 by the Alabama Highway 20 exit. It should be noted that there is no contention that defendant himself was engaged in any transaction with Brashers after they left that point or that he was present when Brashers had any encounters with law enforcement personnel. Furthermore, it should be observed that there is no contention by the State that any of the conduct by defendant after the robbery constituted evidence of flight by him as evidence of his guilt. There is no contention that the evidence which defendant says should have been admitted, should have been admitted on the ground that it tended to explain in a way favorable to defendant other than as it tended to explain in a way favorable to him his conduct in actively participating in the undisputed robbery of Mr. Hogan.
We continue to consider the issues raised by appellant in the order of their presentation in appellant’s brief. The next issue presented is whether the trial court erred in “denying defendant a preliminary hearing.” The motion for a preliminary hearing was filed on September 18, 1979, after the indictment of defendant had been returned, within about fifteen days from *729 his arrest. The position is taken by appellant that he was entitled to a preliminary hearing under Code of Alabama 1975, § 15 — 11—1, providing that one “charged with and arrested for a felony before his indictment shall have an absolute right to a preliminary hearing on said charge” upon his demand therefor “within 30 days following said arrest.” Notwithstanding some ambiguity and resultant confusion in the quoted language of Acts 1975, No. 1205, § 4-106, as codified in § 15-11-1 of the 1975 Code, it was held in Duncan v. State, Ala. Cr.App., 369 So.2d 885 (1979), per Judge Bookout, speaking for the majority, that no reversible error results from the refusal or failure of the trial court to grant defendant’s request for a preliminary hearing that is made after an indictment has been returned against him.
The case was set for arraignment on September 21, 1979, at which time it was made known by defendant that he desired legal counsel and that he was indigent. The court appointed counsel for him, who appeared for and with him in an entry of a plea of not guilty. The case was then set for trial on October 15, 1979. On September 28, it was made known to the court that defendant’s family had employed an attorney for him, and, with the consent of the previously appointed attorney, the retained attorney appeared for defendant and the appointed attorney was released from further responsibility. The employed attorney has represented the defendant since and continues to represent him on appeal. He filed on September 28, 1979, a demurrer to the indictment, a motion for a continuance, a motion to produce, a motion to suppress evidence, and the motion for a preliminary hearing previously considered, which, except the motion to suppress evidence, were set for hearing on October 5. No evidence was taken on the hearing, and there is no transcript of the proceedings as to what occurred on the hearing, but the record proper shows that the court granted a large portion of the relief sought in defendant’s motion to produce, but that it overruled some portions of the motion and overruled defendant’s motion for a continuance, as well as his motion for a preliminary hearing. The record proper does not show any further motion for a continuance, but the transcript shows that when the case was called for trial, the State announced ready and defendant’s attorney stated:
“Judge, we won’t be ready unless Mr. Velez is here and Mr. Daily.”
Thereupon a colloquy occurred among the court and counsel for the respective parties that showed that defendant proposed to use the witnesses to testify as to what occurred between Brashers and law enforcement personnel, including particularly the encounter between him and the officer he shot and who succeeded in killing Brashers on Highway 20 near Madison in Madison County. During the course of the colloquy, the following was stated:
“THE COURT: Well, in other words, I don’t want to start a case and then a witness of questionable admissibility causing a mistrial. That’s my position. It’s very questionable whether that would be admissible. What you have stated. Now, I don’t know and will not rule on it now but I would let you write a showing, if you wish to, subject to legal objection, and if it’s acceptable we would let you use it when the time comes for it.
“MR. NELSON: If it pleases the Court, we take exception to the Court’s statement that it would not be admissible and—
“THE COURT: I didn’t say it wouldn’t be. I said it would be questionable and I will rule on it when the time comes on the admissibility of it.”
It developed on the colloquy that Mr. Velez was the officer that was shot by Brashers and who succeeded in killing Brashers. Thereupon, Lt. Patterson was asked to make a statement as to what he understood from witnesses constituted the details of what occurred, which colloquy was concluded by the following:
“THE COURT: Now, let’s go further with this. Is it my understanding that this statement will be used by the defendant as a showing if they desire to use it subject to legal objection?
*730 “MR. MOEBES: Yes, sir.
“MR. NELSON: Yes, sir.
“THE COURT: All right. Mr. Bailiff, go get the jury and bring them in.”
Although defendant was afforded a more speedy trial than usual, we must conclude that between the date defendant’s motion for a continuance was overruled and the date set for trial, witnesses had become known to defendant’s attorney, who would be available to testify, or a showing of any legally admissible evidence would be made for them and submitted to the jury, and that at that time defendant had no good ground for a continuance. The transcript is clear to the effect that the trial court did not act arbitrarily with reference to its proceeding with the trial, but that with patience it made arrangements for the defendant to present during the trial all admissible evidence that he could present at any future date to which defendant may have desired for the case to be continued. The action of the trial court as to the continuance was well within the court’s discretion.
A final insistence on a reversal and a remandment of the case for a new trial is directed to the sentencing process by the trial court, wherein it considered information contained in a presentence report and thereafter sentenced defendant to imprisonment for life, which of course, was the maximum sentence for the alleged crime. We can understand appellant’s feeling that the sentence was too severe, without necessarily agreeing with him that it was. We do not understand the basis for any contention that he is entitled to a new trial. Whatever the merit of any contention as to the severity of the sentence, it would not suffice to warrant a reversal of the judgment of conviction and a new trial.
There was an unusually lengthy sentencing hearing, at which defendant was allowed to testify at his request, at which the court made it known that it was considering the presentence report of the probation officer. We can conclude from the transcript thereof that it appears that probably, or perhaps, the trial court took into consideration some information adverse to defendant as to other conduct by him of a criminal nature that was in conflict with the testimony of defendant at the sentencing hearing, but the transcript does not conclusively show that the trial court was influenced by such information to impose the sentence it did. Furthermore, we fail to find in the transcript of the proceedings at the sentencing hearing any denial by the court of any ruling invoked by defendant. The closest to such an invocation is found in the following portion of argument of counsel for defendant just before the court pronounced the sentence:
“You don’t know where it [the information contained in the presentence report] came from or who said it or anything else. We object to this type hearsay information influencing the Court and the Court’s decision. I hope it won’t. This young man is 20-22 years old, as I recall, and has never been in any criminal activity in his life. . . . ”
In support of appellant’s final insistence, he cites Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972), and Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948). In Townsend v. Burke, appellant was convicted and sentenced on a plea of guilty. He did not have counsel. In imposing sentence, the court, either through misinformation or misreading of the record, acted on assumptions concerning his criminal record which were materially untrue. The Supreme Court held that:
“Counsel might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records, a requirement of fair play which absence of counsel withheld from this prisoner.”
In United States v. Tucker, supra, there had been a denial of a petition for relief from a conviction of armed bank robbery and a maximum sentence therefore, in which it had been learned years after such convic *731 tion and sentence that two of three previous felony convictions, to which the trial court had given explicit attention in imposing the maximum term, were constitutionally invalid because the accused was denied his right to counsel. The Supreme Court affirmed the action of the Court of Appeals in remanding the case to the District Court for reconsideration of the sentence. In Gardner v. Florida, supra, a death sentence was vacated and the case remanded to the Florida Supreme Court “with directions to order further proceedings at the trial court level not inconsistent with” the opinion. In the plurality opinion of the Supreme Court, it is stated:
“We conclude that petitioner was denied due process of law when the death sentence was imposed, at least in part, on the basis of information which he had no opportunity to deny or explain.”
None of the cases cited supports appellant’s present contention. Whether they offer hope to appellant of postconviction relief, other than by way of this appeal, is not for us to decide. We are confident that the distinguished trial judge would not hesitate to correct a mistake, if any, that he may have been caused to make by reason of any information he received that he determines is factually incorrect.
We find no error in the record prejudicial to appellant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge Leigh M. Clark, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment of the trial court is hereby
AFFIRMED.
HARRIS, P. J., and TYSON, DeCARLO and BOOKOUT, JJ., concur.
BOWEN, J., dissents in part and concurs in part.